UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 05-CR-144-D

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. GEORGE JASON GONZALES,

      Defendant.
_____

**ORDER**
_____

I.    <u>INTRODUCTION</u>

      THIS MATTER is before the Court on several pretrial motions filed by Defendant including several motions to suppress and a motion to sever counts for trial.  The Government filed a consolidated response, and hearings were held on January 19, 2006, and February 2, 2006.

II.    <u>BACKGROUND</u>

      Detective Ricardo Hernandez of the Mountain View Police Department testified that on January 8, 2005, at 3:07 a.m., he pulled over a Mercedes sedan going 65 mph in a posted 35 mph zone.  As Detective Hernandez got out of his patrol car and approached the vehicle, he observed the driver put the car into reverse and begin to back up in his direction.  As the vehicle passed, Detective Hernandez struck the driver's side rear window with his flashlight, losing the flashlight in the process. Detective Hernandez testified that the area was well lit, and that he was able to see the

driver and observe that the driver was the vehicle's only occupant.  Detective

Hernandez estimated that he came within three feet of the vehicle as it sped off.

Detective Hernandez tried to chase the vehicle in his patrol car, but lost sight of it.  A

short time later, Detective Hernandez learned that Denver police officers had located

the Mercedes at 41st Avenue and Winona Court in Denver, Colorado, which was

approximately ten blocks from the site of the attempted traffic stop.  Detective

Hernandez drove directly to the scene and located his flashlight in the vehicle, which

had been abandoned after colliding with three parked cars.  In plain view in the rear

passenger's side of the vehicle, Detective Hernandez and the Denver officers also

found a loaded Winchester, Model 1200, 12 gauge shotgun, serial number 301630,

with a barrel of 13 and 3/4 inches in length and an overall length of 25 and 3/8 inches,

in the back seat and a loaded Ruger, Model 10/22, .22 caliber rifle, serial number 234-

24356, in the trunk of the vehicle.  They also located a Halloween mask, a digital scale,

and baggies.  One of the Denver officers also found an ID card in a first-aid pouch.

The ID card was shown to Detective Hernandez at the scene and Detective Hernandez

identified the photograph on the ID card as the same individual he saw driving the

Mercedes.

Witness Yvonne Verdugo, whose home is very near the crash site, testified that

at 3:15 a.m. on the morning of January 8, 2005, she awoke to the sound of a car crash

outside her bedroom window.  As she looked out the window, she observed a

Mercedes that had crashed into her Nissan Maxima as well as several other cars.  Ms.

Verdugo testified that she observed the sole occupant of the Mercedes, whose face

was illuminated by the dome light of the vehicle, appear to struggle with the gears.  Ms. Verdugo testified that she looked at the driver of the Mercedes for about 30 seconds before leaving her home to confront the driver and get his license plate number.

On March 4, 2005, special agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives met with Ms. Verdugo.  One of the agents explained to Ms. Verdugo that he was going to show her a six-photo lineup, but that she was not obligated to identify any of the individuals in the lineup if she did not recognize anyone. After looking at the photographs, Ms. Verdugo picked the photograph of the Defendant and stated that he was the person driving the Mercedes on the morning of January 8, 2005.  She explained that, because the driver was wearing a hat, she could not be certain as to the hair.  She then circled the photograph she selected, signed her name to the lineup, and wrote underneath the photograph, "IF HAIR WAS THE SAME."  Ms. Verdugo testified that the agents did not attempt to influence her choice nor did they tell her she had made a good or bad choice, nor did they tell her what to write.

On the evening of March 12, 2005, officers from the Westminister Police Department Special Crime Attack Team were working undercover in the City of Thornton.  One of the Westminster officers testified that the officers observed a red Ford pickup with Colorado license plate at a residence in Thornton and began following the vehicle.  The officers had information that the individual who usually drove the pickup had an active arrest warrant.  The officers observed the driver of the pickup fail to signal while making a left turn, and decided to stop the pickup due to the violation of the traffic laws.  After the officers stopped the pickup, and as they exit their vehicle, the

driver of the pickup, later identified as the Defendant, immediately exited the pickup and began walking towards the officers.  One of the officers instructed Defendant to stop.  Defendant eventually stopped after the officer instructed him to do so several times.  Defendant could not produce a driver's license, had no proof of insurance, and was verbally abusive to the officers.  Defendant told the officers that his name was Robert Gonzales, born on August 30, 1976, and that he did not have his driver's license with him.  After determining that there was no driver's license listing under the name and date of birth Defendant provided, the Westminster officers arrested the Defendant for driving without a license, no proof of insurance, and providing false information.  Throughout the stop and investigation, Defendant refused to stand, argued with officers, struggled and turned away, and hindered the officer's ability to place handcuffs on him.  One of the Westminster officers searched Defendant incident to arrest and found two rounds of Chinese-made 7.62 x 39 mm ammunition in Defendant's pants pocket.  When Thornton police officers arrived at the scene they were briefed about the arrest.  Defendant was then transported by the Thornton police to the Thornton - Westminster border and turned over to the Westminster police for booking.

On March 14, 2005, Defendant was interviewed by case agents in custody at the Adams County Jail.  One of the agents testified that the interrogation took place in a large, open room at 4:45 p.m.  Defendant was not handcuffed.  Defendant was informed of his *Miranda* rights and provided a written form detailing those rights. Defendant indicated that he understood his rights and wished to waive them in order to

talk to the agents.  He then signed the written form.  After the form was completed,
Defendant was interviewed and made statements to the agents.  The agent testified
that Defendant never asked to stop the interview and never asked for an attorney, and
that no threats or promises were made to Defendant.

Defendant was subsequently charged with two counts under 18 U.S.C. §§
922(g)(1), possession of a firearm and ammunition by a prohibited person, and one
count alleging violations of 26 U.S.C. §§ 5841, 5871(d) and 5871, possession of an
unregistered short shotgun.  Counts I and II of the Indictment charge that on or about
January 8, 2005, Defendant unlawfully and knowingly possessed an unregistered short
shotgun and, having been previously convicted in 1997 in the District Court of Denver
County Colorado, did unlawfully and knowingly possess other firearms including a
Winchester Model 1200, 12 gauge shotgun, and a Ruger, Model 10/22, /22 caliber rifle.
Count III of the Indictment charges that on or about March 12, 2005, Defendant, having
been previously convicted in 1997 in the District Court of Denver County, Colorado, did
unlawfully and knowingly possess two rounds of Chinese made 7.62 x 39 mm
ammunition.

II.     ANALYSIS

        A.     Motion to Suppress Identification

        Defendant moves to suppress the eye-witness testimonies of Officer Hernandez
and Ms. Verdugo.  Defendant contends that Officer Hernandez's identification of him
based on the ID card found in the abandoned Mercedes amounts to a "one-on-one
show up," and that the discovery tendered by the Government does not indicate that

any "extraordinary circumstances" necessitated the suggestive "show-up" procedure.

Defendant also contends that Ms. Verdugo's identification of Defendant was the result

of an impermissibly suggestive photo lineup procedure.  In his Motion, Defendant

requests that the Court examine the totality of the circumstances surrounding the "one-

on-one show up" and the photo lineup to determine whether the eye witness

identification procedures violate Defendant's due process rights such that the evidence

of the identifications should be excluded from trial.

    As to Officer Hernandez's identification, the Government contends that there

was no "one-on-one show-up."  According to the Government, a "show-up" occurs when

the police present a single individual to a witness for identification purposes.  In this

case, the ID card viewed by Officer Hernandez was not presented to him under

suggestive circumstances.  Rather, the ID card was evidence in the Mercedes that

Officer Hernandez examined as he would any other evidence.  As to Ms. Verdugo's

identification, the Government asserts that the lineup was not unduly suggestive.

    When examining the constitutionality of a pre-trial identification procedure, "we

must engage in a two-tier analysis. First, we must determine whether the procedure

was unnecessarily suggestive. If the procedure is found to have been unnecessarily

suggestive, we must then weigh the corrupting influence of the suggestive procedure

against the reliability of the identification itself." *Grubbs v. Hannigan*, 982 F.2d 1483,

1489-90 (10th Cir.1993) (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).  "[T]he

central question is whether under the totality of the circumstances, the identification

was reliable." *Id.*  "Only when a pre-trial identification procedure is so unnecessarily

suggestive that it is 'conducive to irreparable mistaken identification' does the procedure violate due process." *Id.* at 1490 (quoting *Kirby v. Illinois*, 406 U.S. 682, 691 (1972));  accord *United States v. Thurston*, 771 F.2d 449, 452 (10th Cir. 1985).

The Supreme Court has set forth five factors to be considered in determining the reliability of a pre-trial identification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.  *Id.*  These factors should be weighed against the corruptive effect of a suggestive pre-trial identification procedure to determine whether the identification testimony should have been suppressed.  *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

As to Ms. Verdugo's identification, I agree with the Government that Defendant has not identified any specific problem with the lineup procedure at issue, and based on the evidence presented at the hearings, there is nothing to indicate that the lineup procedure was unduly suggestive.  The photographs used in the lineup are closely matched, the agent administering the lineup did not suggest to Ms. Verdugo that the suspects photograph was among the ones shown to her, and Ms. Verdugo had not seen any other suspects' photographs before she looked at the lineup.  While Ms. Verdugo did qualify her identification by stating "if hair was the same" on the photograph she circled, this fact does not indicate that the line-up procedure was unduly suggestive or improper.  The motion to suppress Ms. Verdugo's testimony and

evidence concerning her identification of Defendant in the photographic line-up is

**DENIED**.

As to Officer Hernandez's identification, the facts in this case indicate that his

identification of Defendant was not the product of an unduly suggestive "one-on-one

show up."  A typical "show-up" occurs when a single suspect is presented to a witness

for identification.  It is true that, in general, "show-up" identifications are condemned

because of their potential to render unreliable identifications.  *United States v. Natalini*,

42 Fed.Appx. 122, 127 (10th Cir. 2002) (unpublished) (citing *Stovall v. Denno*, 388 U.S.

293, 302 (1967).  A "show-up" is unduly suggestive, because presumably the police

would not present an individual to a witness for identification that they did not believe

had committed the crime.  *United States v. Funches*, 84 F.3d 249, 254 (7th Cir. 1996).

In other words, where the witness believes that police officers have identified a

suspect, they are more likely to make a positive identification of that individual.  Here,

Officer Hernandez is a police officer himself, and was shown the ID card in connection

with his investigation of the Mercedes.  While his status as a police office does not

change the fact that he was also a witness, it does diminish the possibility that Officer

Hernandez would be unduly influenced by other officers.  Moreover, Officer Hernandez

was participating in the investigation of the Mercedes, and was aware of the

circumstances surrounding discovery of the ID card.  I find that Officer Hernandez's

identification was not unduly suggestive, and Defendant's Motion to suppress evidence

concerning this identification is **DENIED**.

B.      <u>Motion to Suppress Statements</u>

Defendant next moves to suppress any statements "allegedly made by [Defendant] which the government intends to introduce at trial in this matter." According to Defendant, the statements made by Defendant on March 14, 2005, were the result of a custodial interrogation conducted without providing Defendant the benefit of an appropriate *Miranda* warning.  Defendant's contends that his interrogation took place in an atmosphere of coercion, and that his alleged statements were the products of "threats and promises" rending those statements involuntary and inadmissible.

*Miranda* warnings are required when a suspect is in custody and subjected to state interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 477 (1966).  *Miranda* requires that the following warnings be given: the subject has the right to remain silent; anything said can and will be used against him in court; he has the right to consult with counsel prior to questioning, and to have counsel present at the interrogation; and if he cannot afford an attorney, one will be appointed.  *Miranda*, 384 U.S. at 468-70.

In addition to the above analysis, a statement or confession must also be voluntary.  The determination of voluntariness hinges on the trustworthiness of the evidence.  *See Oregon v. Hass*, 420 U.S. 714, 722 (1975).  The primary criterion of admissibility is the due process voluntariness test.  *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  Under this test, voluntariness is determined by the totality of the circumstances, with the proper test being whether the person's will was overcome, or whether the statement was freely made."  *United States v. Marenghi*, 109 F.3d 28 (10th Cir. 1997); *see also Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998)

(involuntariness is demonstrated where it is shown that the defendant's will was overborne, and his "capacity for self-determination [was] critically impaired"). Once involuntariness is raised, a court must have a hearing on the issue. *Id.* During the hearing, the underlying factual issues and the voluntariness of the confession must be determined. *Id.*

The Government presented evidence at the hearing that Defendant was advised of his *Miranda* rights, and introduced a copy of the written *Miranda* form signed by Defendant. Defendant has failed to identify any deficiencies in the form, and failed to present any evidence that any "threats or promises" were made to him that render his statements involuntary. In addition, the Government presented testimony from one of the case agents who interviewed Defendant that Defendant never asked to stop the interview and never asked for an attorney, and that no threats or promises were made to Defendant. I find that Defendant was advised of his *Miranda* rights and that he voluntarily waived those rights. Therefore, Defendant's Motion to suppress statements made to case agents on March 14, 2005, is **DENIED**.

C.     Motion to Suppress Evidence

Finally, Defendant moves to suppress "any and all evidence obtained as a result of [Defendant's] illegal and unlawful stop, detention and arrest on March 12, 2005, and any evidence derived therefrom." This evidence relates to the charge in Count III of the indictment. Defendant contends that his detention on March 12, 2005, was without a legitimate purpose and the resulting warrantless arrest was without probable cause. Defendant further asserts that his arrest by Westminster police officers was without

probable cause because the arrest took place in Thornton, outside of the officer's

jurisdiction in violation of C.R.S. §16-3-110.

A "routine traffic stop is a seizure within the meaning of the Fourth Amendment."

For purposes of constitutional analysis, however, it is characterized as an investigative

detention rather than a custodial arrest. *Berkemer v. McCarty*, 468 U.S. 420, 439

(1984).  The Tenth Circuit in *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir.

2001) emphasized that traffic stops should be analyzed under the framework of *Terry v.*

*Ohio*, 392 U.S. 1 (1968), even where the stop is based on probable cause.  *Id.* at 1230.

This is because "a typical traffic stop resembles in character the investigative stop

governed by *Terr*y more closely than it does a custodial arrest."  *Id.*

The principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968) mandates a

two-part inquiry.  First, we determine whether the stop was justified at its inception.  *Id.,*

at 20.; *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996). . . . Second, we

determine whether the officer's actions during the detention were reasonably related in

scope to the circumstances which justified the interference in the first place.  *Terry*, 392

U.S. at 20; *Lee*, 73 F.3d at 1038."  *United States of America v. Wood*, 106 F.3d 942,

945 (10th Cir. 1997).  Since *Terry* stop encounters are reviewed "in a step-by-step

manner," the court must analyze the relevant events that transpired in a piecemeal

fashion.  *United States v. Lee,* 73 F.3d 1034, 1038 (10th Cir. 1996) ("We review *Terry*

stop encounters in a step-by-step manner because what may begin as a routine stop

will often escalate into probable cause for a search or a search pursuant to a

consensual encounter.").

A car may be stopped if there is a violation of law, such as traffic law, or if there is a reasonable articulable suspicion that a violation has occurred or is occurring. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc); *See United States v. Scopo*, 19 F.3d 777 (2nd Cir. 1994). It is irrelevant "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." *Botero-Ospina*, 71 F.3d at 787. It is also irrelevant that the officer may have had subjective motives in making the stop. *Id.* Moreover, "[d]uring a traffic stop for speeding, a police officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. . . . The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning. . . ." *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir. 1996) (quotation omitted); *United States of America v. Wood*, No. 96-3141 (10th Cir. 1997)).

Also under *Terry*, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Terry*, 392 U.S. at 24; *see also United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998).

Here, Defendant concedes that he was "arrested by police officers and taken into custody after ostensibly being stopped for failure to use a turn signal." The

-12-

Government presented evidence that the Westminster officers witnessed Defendant commit a traffic infraction, therefore, the traffic stop was justified at its inception.  When Defendant immediately exited the pick-up after the initial stop and began walking towards police officers, and then failed to follow the officer's instructions to stop, the officer's were justified in conducting a pat-down search.  In addition, the officers were justified in detaining Defendant for the purpose of obtaining identifying information.  When Defendant could not produce a driver's license or proof of insurance, the officers were justified in arresting him.

Defendant nevertheless contends in his Supplemental Motion to Suppress that the initial traffic stop was presumptively invalid because the Westminister officers were outside of their jurisdiction.  It is true that the officer's conduct may have violated C.R.S. § 16-3-110.  However, the fact that the Westminster officers were outside of their jurisdiction when they made the initial stop does not necessarily constitute a violation of Defendant's rights under the Fourth Amendment.  *See United States v. Mikulski*, 317 F.3d 1228, 1232 (10th Cir. 2003).  In *Mikulski*, the Tenth Circuit reasoned that while a police violation of state law may be relevant in determining whether police conduct was reasonable, it does not unequivocally establish a Fourth Amendment violation.  Here, based on the facts presented in the parties' briefs and during the hearing, I find that the Westminster officers were justified in stopping Defendant and their actions during the detention were reasonably related in scope to the circumstances which justified the stop in the first place.  Because the officer's actions were justified and reasonable under the Fourth Amendment, Defendant's Motion to Suppress evidence seized during

the March 12, 2005, stop is **DENIED**.

      D.    <u>Motion to Sever</u>

Defendant request that Counts I and II be severed from Count III for trial under Fed. R. Crim. Pro. 14.  According to Defendant, the offense charged in Counts I and II has nothing to with the offense charged in Count III, and he will be significantly prejudiced by the joinder of Counts I and II with Count III.  Defendant contends that the only way to remedy this problem is to sever the counts for trial.

The Government objects to Defendant's request and notes that Fed. R. Crim. P. 8(b) provides for permissive joinder of offenses where the different offenses are "based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  The Government asserts that the Counts "sufficiently linked" because (1) they all involve firearms; (2) both Count Two (possession of firearms by a convicted felon) and Count Three (possession of ammunition by a convicted felon) involve the same felony conviction, and (3) the factual circumstances of the offenses both involve possession of firearms or ammunition while driving.

Rule 14 provides a basis for the entering of a discretionary severance where prejudice is shown.  This rule states in pertinent part:  "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

The Supreme Court in *Zafiro v. United States*, 506 U.S. 534, 539 (1993)

addressed this issue and held that a severance should only be granted "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  There is a preference for joint trials.  *Id.*  It is not enough that a severance would increase defendant's chances of acquittal or that he is less culpable than his co-defendant.  *United States v. Paveto*, 881 F.3d 844, 857 (10th Cir.), *cert. denied*, 493 U.S. 944 (1989); *United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir.), *cert. denied*, 117 S.Ct. 136 (1996).  The defendant bears a "heavy" burden" of demonstrating real prejudice from joinder.  *United States v. Dickey*, 736 F.2d 571, 589 (10th Cir. 1984).  This showing must affirmatively demonstrate that defendant's right to a fair trial has been abridged.  *United States v. Troutman*, 814 F.2d 1428, 1447 (10th Cir. 1987).  Naked allegations that the evidence may be disparate as to each defendant, that severance might improve a defendant's chances for acquittal, that a codefendant is charged with additional substantive offenses, or that the "spillover" effect of the evidence against a codefendant might damage the defendant are all insufficient to establish prejudice.  *United States v. Barker*, 623 F. Supp. 823, 834 (D. Colo. 1985); *United States v. Hack*, 782 F.2d 862, 870 (10th Cir. 1986).

I find no merit to Defendant's Motion to sever.  Defendant has not established evidence of prejudice sufficient to justify severance of the counts in this case.  Moreover, an appropriate jury instruction could cure any potential prejudice to Defendant.  Defendant's Motion to Sever is **DENIED**.

III.   CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion to Suppress Identification, filed December 1, 2005, is **DENIED**.  It is

FURTHER ORDERED that Defendant's Motion to Suppress Statements, filed December 1, 2005, is **DENIED**.  It is

FURTHER ORDERED that Defendant's Motion to Suppress Evidence Seized During Illegal Detention of George Gonzales on March 12, 2005; filed December 1, 2005, is **DENIED**.  It is

FURTHER ORDERED that Defendant's Supplemental Motion to Suppress Evidence Seized During Illegal Detention of George Gonzales on March 12, 2005, filed December 14, 2005, is **DENIED**.  It is

FURTHER ORDERED that Defendant's Motion to Sever Counts of Indictment, filed December 1, 2005, is **DENIED**.  It is

FURTHER ORDERED that a THREE-DAY JURY TRIAL in this case shall commence at **9:00 a.m. on Monday, March 13, 2006**, to be preceded by the final trial preparation conference, which shall take place at **8:30 a.m. on Monday, March 13, 2006.**

Dated:  March 1, 2006

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge

-16-